The Princess Garment Company v. Commissioner.
Princess Garment Co. v. Commissioner
Docket No. 109874.
United States Tax Court
1942 Tax Ct. Memo LEXIS 75; 1 T.C.M. (CCH) 186; T.C.M. (RIA) 42639; November 25, 1942
*75 In 1939 petitioner created a pension plan under which it established a trust to which it paid $25,000 for the purpose of paying premiums on annuity and insurance policies on certain of its employees and officers whose services were vitally important to its continuing prosperity. Held, that under the facts, petitioner is entitled to deduct the amount so paid under the provisions of section 23 (p), Internal Revenue Code. Lester A. Jaffe, Esq., 1616 Union Central Bldg., Cincinnati, O., and Harry Stickney, Esq., 1616 Union Central Bldg., Cincinnati, O., for the petitioner. Melvin S. Huffaker, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion The respondent determined deficiencies of $4,554.48 and $1,029.04 in the petitioner's income and excess profits taxes respectively for the year 1939. The single issue is whether or not the petitioner is entitled to the deduction of a $25,000 payment made to an employees' pension trust. In the alternative, the petitioner claims the deduction as an ordinary and necessary business expense. Findings of Fact Certain facts were stipulated and as so stipulated we adopt them as a part of our findings of fact. In so far as they *76 are material to the issue they are substantially as follows: The petitioner is an Ohio corporation with its principal place of business in Cincinnati, Ohio. The return for the period herein involved was filed with the Collector of Internal Revenue for the first district of Ohio. The petitioner is engaged in the manufacture of ladies' and children's garments and in the sale of such garments and related items made directly to consumers through sales representatives who solicit orders therefor from such consumers. Delivery is made by the petitioner directly to the purchasing consumers by mail. On December 22, 1939, the Board of Directors of the petitioner adopted a plan establishing a pension trust and named Philip Meyers, Sidney Meyers and Melville Meyers as the Board of Managers of the Trust. They also authorized the payment of at least $25,000 to create the pension trust fund and to operate it for the year 1939. They further authorized the payment of such sums as might be found necessary to maintain the successful operation of the pension trust during each succeeding year of the life of the trust. They designated The First National Bank of Cincinnati, Ohio, as trustee. The purpose *77 of the pension plan was to reward the faithful service of certain officers and employees, to foster a feeling of greater loyalty to the company and to provide appropriate protection for such officers and employees when confronted with infirmity or old age. The pension plan, hereinafter called the Plan, provided that a trust should be established for the benefit of officers and employees earning $2,500 per year and over; that the petitioner would make an initial payment of not less than $25,000 and that from time to time the petitioner would pay to the trust, amounts necessary to operate the Plan successfully. The Plan outlines the conditions and terms as later reflected in the trust agreement. The beneficiaries of the Plan were only those who earned annually $2,500 and over, who were between the ages of 21 and 35 and who had been employed by the petitioner at least twelve months. The Board of Managers was empowered to determine the amount of the pension of each applicant on the basis of all relevant factors, such as length of service, ability, value of service and salary. Pensions were payable at age 65. If the participant should become incapacitated, the contract purchased by *78 the trustee on his life would be assigned to him. If he were discharged or should leave petitioner's employ during the first ten years of his participation in the Plan, he would have no claim on the funds deposited for his benefit, nor on the contracts purchased therefrom, but the accumulations to his credit would revert to the corpus of the trust. If, however, he should resign or voluntarily leave the employ of the petitioner after such ten-year period, the annuity or life income contract purchased by the trustee on his life would be assigned to him. If the pensioner should die before the pension would become payable, the entire proceeds of the life income or annuity contract would be paid to the decedent's designee or, if no designation had been made, to his administrators or executors. The Plan further provided that the petitioner "hereby waives, surrenders and relinquishes all right, title and interest in and to any of the funds or property of the Pension Trust, whether contributed thereto by it or otherwise received by the Trustee". The petitioner also reserved the right to amend or revise the Plan provided such amendment or revision should not "as determined by the Board of *79 Managers, detrimentally affect or impair the rights of any officer or employee already a participant in said Pension Trust, nor revest in the Company any claim, interest or right in and to any of the funds or property of the Pension Trust". The petitioner had no right to modify or amend the trust agreement so as to take or obtain for itself any interest in the insurance contracts. On December 28, 1939, by authority of the petitioner's Board of Directors, the petitioner executed a trust instrument with The First National Bank of Cincinnati, Ohio, as trustee, in which the trustee agreed to carry out the instructions of the Board of Managers relating to the purchase of insurance contracts or policies for the benefit of the petitioner's officers and employees who were included in the Plan and to take all appropriate action in connection therewith. Provisions were made for the disposition of the policies in case the beneficiaries left the employ of the petitioner and for other routine procedure. On December 29, 1939, the petitioner paid to the trustee the sum of $25,000. The trustee made disbursements therefrom aggregating $24,817.20 for the first year's premiums due on each of the policies *80 purchased for the Plan. No money was paid or contributed by any beneficiary thereunder. All of the policies are now in full force and effect and have been, since their inception, in the possession of the First National Bank of Cincinnati, Ohio, as trustee, with the exception of Policy No. 10951895 for the benefit of Melville Meyers, which was discontinued by the Board of Managers as of the first anniversary date. The amounts paid as first year premiums on the policies issued to the trustee for the benefit of the various beneficiaries and the annual amounts payable to them at retirement age pursuant to the terms and conditions of the Plan, were as follows: First Yr.
Ann. Inc.
Ann. Inc.
Name
Insurance Co.
Pol. No.
Premium
age 55
age 65
Philip Meyers
State Mutual
R-4675
$2,500.00
$13,830.00
$30,000.00
Prudential
10941208
2,000.00
Conn. General
59584
1,500.00
Provident Mut
907480
2,000.00
New England Mut
A-34321
1,800.00
John Hancock
060745
4,831.00
Sidney Meyers
Northwestern
3005603
5,784.50
6,556.50
15,000.00
* Melville Meyers
Prudential
10951896
821.00
2,400.00
Clarence Israel
Northwestern
3005699
255.70
600.00
Ferdinand Schott
Northwestern
3005602
233.00
600.00
Chas. Jennings
Northwestern
3005600
169.95
600.00
Martin Rotter
Northwestern
3005501
162.95
600.00
Albert Pollock
John Hancock
060747
173.95
600.00
*81 During the year 1939 the issued and outstanding capital stock of petitioner was 100 shares of preferred stock, 100 shares of no par Class A stock and 150 shares of no par Class B stock. The Class B stock carries all the voting rights unless there is default in the payment of dividends on the preferred or Class A stock. The stockholders of the petitioner as of December 31, 1939, were as follows: SHARES
Pre-
Name
ferred
Class A
Class B
Mitchell Meyers
10
100
Philip Meyers
5
65
Sidney Meyers
10
30
Melville Meyers
10
18
Albert Meyers
10
12
Leona Rosenthal
10
12
Philip Meyers, Trustee
for Philip Meyers,
Jr
20
3
Philip Meyers, Trustee
for Lynne Meyers
20
3
Lucille Meyers
5
7
100
100
150
The names of all employees originally selected for participation in the pension plan, the official position of each, the number of years service with petitioner and the annual salary of each at the time of the inception of the pension plan, were as follows: Years of
Annual
Name
Position
Service
Salary
Philip Meyers
Vice President
19
$30,000.00
Sidney Meyers
Production Manager
7
15,000.00
Clarence Israel
Mgr. of Hartford Dept
7
6,500.00
Ferdinand Schott
Sales Manager
1
3,900.00
Chas. Jennings
Efficiency Engineer
4
3,075.00
Martin Rotter
Purchasing Agent
6
2,615.80
Albert Pollock
Purchasing Agent
6
2,880.00
Melville Meyers
Printing Purchaser
14
2,600.00
*82 The number of persons employed by petitioner by months during the year 1939 in both its office and factory was as follows: No. of Em-
No. of Em-
ployees on
ployees on
Factory
Office
Month
Payroll
Payroll
January 13
297
358
February 17
365
270
March 17
366
227
April 14
356
267
May 12
342
206
June 16
335
207
July 14
324
269
August 18
308
362
September 15
343
213
October 13
353
201
November 17
350
201
December 15
373
202
The net income of the petitioner for the year 1939 as disclosed by its 1939 income tax return was in excess of $283,000. Dividends declared by the petitioner on its issued and outstanding stock for the calendar year 1939, as stated in its income tax return, aggregated $162,000. In December, 1939 Melville Meyers' aggregate compensation received from the petitioner and from B. J. Melville Company (a corporation whose preferred stock is owned by the petitioner) was $9,000 per year. In the fall of 1940, Policy No. 10951895, issued by the Prudential Insurance Company for the benefit of Melville Meyers, was withdrawn from the Pension Trust and Melville Meyers personally reimbursed the trustee for the cash value thereof. *83 In December 1940, the petitioner paid to the trustee $20,620.64 to cover the net second annual premium on the trust policies and in December, 1941, it paid $22,231.05 to cover the net third annual premium thereon. The record disclosed the following additional facts: The petitioner is not engaged in the mail order business. Orders for garments are obtained through sales representatives, generally women, located in all parts of the country. In 1939, the petitioner had about 60,000 sales representatives, of whom from 20,000 to 25,000 were usually quite active. The petitioner occupied an outstanding position in its industrial field. In 1939 Philip Meyers was the president of the "National Association of Direct Selling Companies of America" and held such office for three terms. The petitioner first considered the pension plan in 1936 but largely on account of the flood of January, 1937, it sustained a heavy loss and hence was not interested in such a plan. In 1938, the petitioner was concerned with restoring its business position and, with that accomplished during that year, consideration of the pension plan was resumed in 1939. Philip Meyers, Sidney Meyers, Albert Meyers and Leona *84 Rosenthal are all children of Mitchell Meyers. Lucille Meyers is the wife of Philip Meyers and Philip Meyers, Jr. and Lynne Meyers are his minor children. The trusts for the said minor children are irrevocable. In 1939 the average age of petitioner's office employees was about 25 years and the average of its factory employees was about 33 years. Only three out of over 300 employees in the petitioner's office during that year were over 40 years of age, and out of an average of 343 factory employees, only between 20 and 25 were 40 years of age. The percentage of annual turnover for office and factory employees is 49 per cent and 50 per cent, respectively. The small number of employees over 40 years of age employed by the petitioner and the large percentage of turnover are not due to the discharge of employees by petitioner after short periods of employment. Most of the employees are young women. During the year 1939, of 701 who were employed in the office at some time during the year, 664 were women and seven were men. In the factory, 98 per cent are women and of these, 85 per cent to 90 per cent are married women. Since most of the women employees are young, a large number get married *85 and voluntarily leave the employ of the petitioner. Others who are married leave as soon as they have children and do not return. Other married women employees leave "when their husbands are doing well." In addition the seasonal character of the business contributes to the large turnover. Out of all the employees of petitioner, in both factory and office, only eleven earned more than $2,500 per year during the calendar year 1939. One of these, Mitchell Meyers, then president of petitioner, was over 65 years of age when the Plan was put into effect and was, therefore, not included. Another, J. D. Park, then earning $3,000, was not included because he had been with the company for a very short time and his department was experimental. George Rutmann was employed less than a year. The remaining eight were included in the Plan. If $2,000 or $1,500 had been used as a minimum basis for inclusion in the plan, four and eight additional employees, respectively, would have shared therein. The success of petitioner's business peculiarly depends first, on a primary group of employees, viz., Mitchell Meyers, Philip Meyers and Sidney Meyers. Mitchell Meyers was 66 years of age at the inception *86 of the Plan. Philip Meyers and Sidney Meyers "carry the load of the whole business." The secondary group of employees consists of those not so important but whom it requires a few years to train. All of the members of the primary and secondary groups are beneficiaries under the Plan excepting only Mitchell Meyers and J. D. Park, whose department was experimental. All of the included employees are "key employees" in the business. Those employees who are easily replaceable, have no appreciable effect on the business, and occupy no responsible position, do not participate in the Plan. Philip Meyers was president of petitioner at the time of the hearing but was vice-president during the year 1939. He has been associated continuously with petitioner's business since 1922 and was responsible for petitioner's inaugurating the policy of direct selling in the fall of 1925. He was in charge of the general policy of the company, its financial problems and policies, all merchandising, which includes the preparation of the catalogue and the determination of how much merchandise to purchase. He is also in charge of advertising and all sales. Sidney Meyers was vice-president and secretary of *87 petitioner at the time of the hearing, but was secretary of petitioner in 1939. He was in charge of production, personnel, labor relations and the various purchasing departments that have to do with the manufacturers who make goods for petitioner. The petitioner's gross sales and net profits at intervals during 1922 to 1941, were as follows: Gross Sales
Net Profits
1922
$ 161,000.00
1934
$177,246.11
1925
223,000.00
1935
83,475.38
1928
502,000.00
1936
28,130.85
1930
915,000.00
1937
12,385.49
(Loss due to flood)
1934
$3,275,000.00
1938
$ 87,260.30
1939
4,913,000.00
1939
274,433.96
1940
5,330,000.00
1940
167,642.40
1941
224,620.61
The petitioner carried $368,000 and $225,000 of life insurance on the lives of Philip Meyers and Sidney Meyers, respectively. It paid respective annual premiums of $11,003 and $4,762 thereon. The business of the company is peculiarly dependent on Philip Meyers and Sidney Meyers. The death or incapacity of either would impose a loss on the petitioner while trying to replace him. The salaries of Philip Meyers and Sidney Meyers were as follows: Year
Philip Meyers
Sidney Meyers
1935
$25,000
$15,000
1936 25,000
15,000
1937 None (flood)
6,500
1938 25,600
11,225
1939 30,000
15,400
1940 30,000
15,000
1941 30,000
15,000
*88 Opinion VAN FOSSAN, J.: The sole question presented is whether or not the sum of $25,000 paid by the petitioner to an employees' pension trust is deductible from its gross income. The deduction is asked under the provisions of section 23 (p), Internal Revenue Code. If that section is found inapplicable, the petitioner seeks the deduction as an ordinary and necessary business expense as provided in section 23 (a) (1), Internal Revenue Code. Both the petitioner and the respondent agree that the answer to the first question lies in the proper interpretation and application of section 165 (a) (1) [1], Internal Revenue Code. The respondent contends that the benefits received from the Plan by the principal stockholders of the petitioner bore a definite and direct relation to the proportions of stock held by them. Therefore, he charges, the Plan was merely a device for distributing corporate earnings in lieu of dividends and thus enabled the Meyers brothers to escape their individual income taxes. He concludes that consequently the Plan was not exempt from taxation under section 165 and that the sums so paid by the petitioner are not deductible under section 23 (p). *89 In his opening statement at the hearing, counsel for the respondent stated: "There is no question of bona fides involved in this trust". On brief he concedes that the trust was a "bona fide juristic trust" but denies that the Plan was established in good faith. His position is hard to understand. The trust was an inseparable part of the Plan. If the Plan was surcharged with mala fides, as the respondent asserts, it seems impossible that the trust could escape its taint. The essence of the case at bar is the good faith of the petitioner and its board of directors in establishing the Pension Plan. We find nothing in the stipulated facts, in the evidence adduced at the hearing, or in the demeanor of the witnesses to cast any suspicion on their actions or to impute to them any improper and sinister motives. By an arithmetical grouping of figures the respondent attempts to show that the first year premiums paid on behalf of certain active stockholders were approximately proportionate to their common voting stock interests. In so doing he includes stock in an irrevocable trust established for the benefit of Philip Meyers' children and stock owned outright by his wife. *90 He also disregards stock owned by others than the three Meyers brothers. He likewise includes in his calculations Policy No. 10951895, issued to Melville Meyers, on which the petitioner paid a premium of $2,586.15 but which was withdrawn in 1940, reimbursement being made to the trustee for the cash value thereof. The policy is not included in the stipulated table of first year (1939) premiums. The correct amounts and percentages of salaries, pension trust payments and stockholdings of the Meyers brothers are as follows: Pension
Percent-
Stock-
Percent-
Salary
Percentage
Payments
age
holdings
age
Philip Meyers
$30,000.00
62.5
$14,631.00
58.5
65
43.3
Sidney Meyers
15,400.00
32.1
5,764.50
23  30
20  Melville Meyers
2,600.00
5.4
821.00
3.3
18
12   At a glance we see the mathematical inaccuracy of the respondent's position. As we view the situation, the services of Philip Meyers and Sidney Meyers were of great value to the petitioner. Its outstanding success in its peculiar industrial and commercial field was due almost wholly to their efforts. The petitioner's business required only a few top-ranking persons whose continued association *91 with the company would be beneficial to it. Those were all included as beneficiaries of the Plan. The Plan was adopted in order to give proper recognition to the worth of its beneficiaries to the petitioner and to induce them to remain with it. We note that Mitchell Meyers, a large owner in the company, was omitted from the benefits of the Plan because he was over the age fixed. The creation and continuance of the Plan were based on the relationship of employer and employee. The Plan appears to be precisely the kind of a pension institution contemplated by the statute. It was created for the exclusive benefit of some of the employees, thereby satisfying the statutory requirement. The trust is exempt under the provisions of section 165. The pension plan in the case of Raymond J. Moore, et al., 45 B.T.A. 1073, cited and relied on by the petitioner, is particularly in point. In no important features does it differ from the Plan before us. The Board there held that the pension trust was within the provisions of section 165, and stated: * * * These employees are chosen because of their value to the business of the company. To provide for the custody and *92 maintenance of the funds which, under the plan, it pays in each year, a trustee has been formally appointed under a deed of trust. Under the plan and deed of trust the amounts paid by the company to the trustee pass from its possession and control, and are administered wholly for the benefit of the employees participating in the benefits awarded. Upon the payment of these moneys to the trustee the company loses all its rights thereto. It is evident that the creation of this plan and the trust is not a subterfuge by which earnings of the company are distributed to stockholders as such. Although the participant petitioners are stockholders, as well as employees, the monetary benefits were awarded to them as employees. These benefits bear no relation to their respective stock interests in the company. The above might well have been written of the present case. Cf. W. F. Parker, et al., 38 B.T.A. 989, where the Board held that the trust was created primarily for the benefit of the principal stockholder, was under his domination and hence was not within section 165 of the Revenue Act of 1934. We hold that the $25,000 paid by the petitioner to the pension *93 trust is a proper deduction under the provisions of section 23 (p). In view of our decision on the primary issue, the alternative question need not be considered. Decision will be entered under Rule 50. Footnotes
*. Pol. No. 10951895 (Ex. 0-9) is omitted as set forth hereafter).↩
1. SEC. 165. EMPLOYEES' TRUST A trust forming part of a stock bonus, pension, or profit-sharing plan of an employer for the exclusive benefit of some or all of his employees - (1) If contributions are made to the trust by such employer, or employees, or both, for the purpose of distributing to such employees the earnings and principal of the fund accumulated by the trust in accordance with such plan, and * * * * *
shall not be taxable under section 161, but the amount actually distributed or made available to any distributee shall be taxable to him in the year in which so distributed or made available to the extent that it exceeds the amounts paid in by him. Such distributees shall for the purpose of the normal tax be allowed as credits against net income such part of the amount so distributed or made available as represents the items of interest specified in section 25 (a).↩